UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
TRACEY WONG,

                             Plaintiff,

        - against -

BLIND BROOK-RYE UNION FREE SCHOOL
DISTRICT, JONATHAN ROSS, individually, and
PATRICIA LAMBERT, individually,

                           Defendants.
---------------------------------------------------------------x

**OPINION & ORDER**

No. 20-CV-2718 (CS)

<u>Appearances</u>:

Tracey Wong
Scarborough, New York
*Pro Se Plaintiff*

Scott P. Quesnel
Girvin & Ferlazzo, P.C.
Albany, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

       Before the Court are the parties' cross-motions for summary judgment.  (ECF Nos. 44,

61.)  For the following reasons, Defendants' motion is GRANTED and Plaintiff's motion is

DENIED.

## I.     **BACKGROUND**

       This case arises out of the alleged discrimination and retaliation that Plaintiff Tracey

Wong claims to have experienced at her former workplace, the Blind Brook-Rye Union Free

School District (the "District").

A.   **Facts**

The following facts are based on the parties' Local Civil Rule 56.1 Statements,

responsive 56.1 Statements, declarations, and supporting materials.[1]  The facts are undisputed

except as noted.

_____

[1] As previously noted by the Court, "[t]his matter is procedurally confusing," (ECF No. 64), in large part due to Plaintiff's multiple filings.  The instant motion was filed on March 7, 2022.  (ECF Nos. 44-51.)  Plaintiff then filed papers that purported to be a cross-motion, (ECF Nos. 52-53), but did not include a memorandum of law.  I construed these submissions to be her opposition to Defendants' motion.  (ECF No. 56.)  After Defendants filed their reply, (ECF Nos. 57-59), Plaintiff filed another 56.1 Statement, (ECF No. 62), with attachments, (ECF No. 61), and a document titled, "Plaintiff's Section 1746 Statement in Opposition to Defendants' Motion for Summary Judgment," (ECF No. 60).  In an excess of caution, I accepted those papers but ordered each side to respond to the other's Local Rule 56.1 Statement.  (ECF No. 64.)  Defendants did so, (ECF No. 67), but Plaintiff did not.  She thereafter filed what appears to be another 56.1 Statement, (ECF No. 70), along with a document titled, "Plaintiff's Statement in Response to Defendant's Submission Pursuant to Southern District Court Local Civil Rule 56.1," (ECF No. 71).

As noted, Plaintiff never filed a response to Defendants' Local Rule 56.1 Statement. That Rule requires that the party opposing a motion for summary judgment submit a counterstatement responding to the moving party's statement of material facts, indicating which facts are admitted and which the opposing party contends are in dispute and require a trial.  L.R. 56.1(b).  "If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."  *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) (citing L.R. 56.1(c)).  *Pro se* litigants are not excused from this requirement. *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 344 n.4 (S.D.N.Y. 2011).  I have discretion to deem admitted any properly supported facts in Defendants' Local Rule 56.1 Statement.  *Vance v. Venettozzi*, No. 18-CV-748, 2021 WL 4145705, at *3 (N.D.N.Y. Sept. 13, 2021).  (The Court will send Plaintiff copies of all unpublished decisions cited in this Opinion and Order.)  But granting Plaintiff special solicitude in light of her *pro se* status, I have also considered all of her *pro se* submissions – even those to which Defendants have not had the opportunity to reply – to the extent the assertions therein are properly supported with citations to evidence and to the extent that that evidence can be located in the record.  Several exhibits to which Plaintiff points are not in the record.  (*See* ECF No. 73.)  I have also considered her Affidavit, which – as discussed below – was untimely filed when Plaintiff was represented by counsel.  (ECF No. 34-1 ("P's Aff.").)  *See Holtz v. Rockefeller & Co*., 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.") (cleaned up).

Plaintiff Tracey Wong brings this action against the District, Jonathan Ross, and Patricia Lambert.  (ECF No. 1 ("Compl.").)  Plaintiff identifies as an Asian-American woman of Chinese immigrant origins.  (P's Aff. ¶ 6.)  The District is a public school district located in Westchester County, New York.  (ECF No. 45 ("Ds' 56.1 Stmt.") ¶ 1.)  During the relevant period, Defendant Ross was the District's Superintendent of Schools and Defendant Lambert was the Principal of the District's high school.  (Id. ¶¶ 2-3.)

### 1.    Plaintiff's Hiring

The District's middle and high schools are located on the same campus but are in different buildings that are connected by the Monroe E. Haas Instructional Media Center (the "IMC"), which is the library for both schools.  (Id. ¶ 5.)  The IMC is centrally located and students from sixth to twelfth grade go to the IMC to study and learn.  (Id. ¶ 6.)  At the high school, there are no assigned study halls, so students often go to the IMC to have a quiet place to study.  (Id. ¶ 7.)  Defendants Ross and Lambert both describe the District as high performing, where students "strive for excellence, so having a quiet place to study is very important to [the] upper-level students and their parents."  (ECF No. 48 ("Ross Aff.") ¶ 5; ECF No. 65-1 ("Lambert Aff.") ¶ 4.)

The District employs a Library Media Specialist ("LMS") who oversees and coordinates activities in the IMC.  (Ds' 56.1 Stmt. ¶ 9; Lambert Aff. ¶ 5.)  Jean Follansbee, who is older than Plaintiff, served as the District's LMS for about eleven years and retired at the end of the 2016-2017 school year.  (Ross Aff. ¶¶ 6, 13; Lambert Aff. ¶¶ 5, 15.)  In the summer of 2017, the District publicly advertised for the vacant probationary LMS position, and received about sixteen applications, including Plaintiff's.  (Ross Aff. ¶ 6; Lambert Aff. ¶ 5.)  At this time, Plaintiff was about a month away from her fiftieth birthday and had three Masters' degrees and about sixteen

years of experience.  (Ds' 56.1 Stmt. ¶¶ 64, 67.)  She was also tenured by a New York public school district.  (ECF No. 67 ("Ds' Reply 56.1 Stmt.") ¶ 6.)  Plaintiff has received various awards, including from ALA Scholastic Publishing in 2016 and the Lemelson-MIT InvenTeam in 2017.  (ECF No. 62 ("P's 56.1 Stmt.") ¶ 1.)

The District selected Plaintiff, along with five others, to interview with the hiring committee.  (Ross Aff. ¶ 6; Lambert Aff. ¶ 5.)  Defendant Lambert, who was about sixty-four at the time, advocated in favor of hiring Plaintiff, and Defendant Ross, who was about sixty-one at the time, interviewed Plaintiff and agreed that she was a desirable candidate.  (*See* Ross Aff. ¶¶ 6, 14; Lambert Aff. ¶¶ 5, 16.)  Plaintiff states that during one of her interviews, Defendant Lambert asked how Plaintiff felt about innovation in the school library, to which Plaintiff responded, "I want[] to run a very active and innovative school library," and then gave Defendant Lambert examples of her vision for the library as "more than just a space to house books and for students to study."  (P's Aff. ¶ 9.)  Plaintiff believes that Defendant Lambert was "excited by her innovation in previous libraries as the district was building an innovation lab," and Defendants agree that Defendant Lambert recommended her based on, among other things, her expressed vision.  (Ds' Reply 56.1 Stmt. ¶ 1.)  No one made any negative comments about Plaintiff's age during the interviews, (ECF No. 47-1 ("P's Depo. 1") at 64:24-65:1), but Plaintiff says Defendant Ross asked how many children she had and how old they were, (P's Aff. ¶ 8.)  Ross states that it would not be unusual for him to ask that question, because it is a selling point that employees' children can attend the District's high-performing schools without paying non-resident tuition.  (Ross Aff. ¶ 15.)

Before Plaintiff was hired, in an email to Ross thanking him for the interview, she discussed some of her proposed innovations, in which she stated that she intended to "push the

envelop [*sic*]," and that "[w]hile Blind Brook does have different dynamics and demographics [than her previous school], [she] w[ould] continue [her] grant writing on [her] own." (ECF No. 32-3 at 2*.*) She also says she discussed some proposed innovations with Lambert, who was excited about them. (P's Aff. ¶ 10.) Before accepting the position, Plaintiff inquired with Lambert about extracurricular activities and the stipends available for faculty who supervised them. (ECF No. 49-1.)

After engaging with Plaintiff in salary negotiations in mid- to late July 2017, (Ross Aff. ¶ 6), Ross sent Plaintiff a letter on July 27, 2017, stating that he would recommend to the school board that she be hired for a four-year probationary term at a negotiable starting salary of $103,941, (ECF No. 48-1 at 2). Plaintiff signed at the bottom under a paragraph that stated, "I accept the terms and conditions of employment offered to me by the Blind Brook-Rye UFSD. This acceptance includes the commitment to fulfill the obligations of this employment during the 2017-2018 school year, unless released from this commitment, in writing, by the Superintendent of Schools." (*Id.*) After signing the letter, however, Plaintiff reached out to Ross because she thought she was entitled to a probationary term of three years, not four, because she had received tenure at her previous school district. (P's Aff. ¶ 11; Ross Aff. ¶ 7.) Ross agreed, and on August 14, 2017, he recommended Plaintiff for a three-year probationary position as "Probationary Library Media Specialist." (Ross Aff. ¶ 7; ECF No. 48-2 at 2.) The District's Board of Education unanimously voted to approve Ross's recommendation. (Ross Aff. ¶ 7.) The vote was memorialized in a letter from Ross to Plaintiff, dated August 15, 2017. (*Id.*; ECF No. 48-2 at 2.)

##### 2.    Plaintiff's Employment

According to Plaintiff, in September or October 2017, after she let Defendant Lambert know that Plaintiff "was not going to take the after school club, activities that [Lambert] wanted [Plaintiff] to take on," (ECF No. 68-1 ("P's Depo. 2") at 30:24-31:2; *see* P's Aff. ¶ 18), Lambert told Plaintiff that "if [Plaintiff] wanted to fit into the school culture, [she] needed to do the activities.  [Lambert] said [Plaintiff's] children were older and [she] didn't need to be home right away."  (P's Depo. 2 at 31:3-7.)  She added that failure to supervise extracurricular activities could negatively impact Plaintiff's chances for tenure.  (*Id.* at 31:7-13.)

In mid-October 2017, Defendant Lambert learned that Plaintiff had arranged to have a graphic novelist named David Roman come to speak at the IMC.  (*See* ECF No. 49-2 at 2; P's Aff. ¶ 19; P's Depo. 1 at 125:11-17.)  Teachers at the District were instructed that Parent-Teacher Association ("PTA") funding must be approved by their principal, so teachers typically sent their PTA funding requests to Lambert, who would then forward the requests to the PTA after approving them.  (Lambert Aff. ¶ 7; *see* P's Aff. ¶ 19.)  According to Lambert, she learned of Plaintiff's proposed event shortly before it occurred, and she was concerned because Plaintiff had sought funding directly from the PTA without getting Lambert's approval.  (Lambert Aff. ¶ 7.)  She was also concerned that students would be encouraged to buy books and that the speaker was geared to younger readers, not the middle- and high-school students who used the IMC.  (*Id.*)  She emailed Plaintiff, expressing concerns:

> Have you heard back from the PTA?  Have they approved the funding?  If not – you cannot continue.  We need approvals before we make commitments.  Also – why are we selling books?  Why wouldn't we encourage students to bring their own books with them for autographs?  Which book is it?  These are all books for 8-11 or 13 year old students.  Are you planning on sending it to high school students?  Can you stop down and see me?

(ECF No. 49-2.)[2]  Lambert states that she was also concerned that Plaintiff had not solicited input from the middle and high school English departments or other faculty members before proceeding with this graphic novelist as a speaker.  (Ds' 56.1 Stmt. ¶ 31.)

Plaintiff, on the other hand, states that on September 11, 2017, she visited Defendant Lambert's office, where she asked for permission to host the graphic novelist, and that Lambert said was a "great idea."  (P's Aff. ¶ 19.)  Plaintiff claims she had inquired about having a book fair to raise the money for Roman's honorarium, and Defendant Lambert informed her that because this was a "high performing school district," the PTA usually funds special projects and Plaintiff did not need to fundraise herself.  (*Id.*).  Defendant Lambert then allegedly provided Plaintiff with a PTA form and told her to speak with Todd Richard, the middle school principal. (*Id.*)  Plaintiff claims she then emailed Mr. Richard on September 20, 2017.  (*Id.*)[3]  Shortly after, according to Plaintiff, she and Richard met with Jon Ambrosio, the head of the English department, and Plaintiff did not invite Roman until after she obtained Defendant Lambert's written approval and PTA funding.  (*Id.* ¶ 20.)[4]  Plaintiff states there were no concerns expressed about her "not following the procedure for securing Roman's visit," or about "the appropriateness or inappropriateness of eventually inviting Roman or of Roman's eventual visit." (*Id.* ¶ 21.)

Thereafter, in mid-October 2017, the District found out that Plaintiff had solicited donations on a website, www.donorschoose.org.  (Ross Aff. ¶ 8; Lambert Aff. ¶ 9.)  This

---

[2] The email chain begins with Plaintiff asking Lambert for approval for a document, which is not attached, to "go out."  (ECF No. 49-2.)

[3] Although Plaintiff's affidavit says this email can be found as Exhibit 10 to her attorney's affidavit, (P's Aff. ¶ 19 n.8), there is no such exhibit, (*see* ECF Nos. 32-34), and the Court has not located it elsewhere.

[4]The written approval is not in the record.

platform allows teachers to post classroom project requests to which individuals can donate. (Ds' 56.1 Stmt. ¶ 34.)  Plaintiff posted a few different projects, including one identified as a "Sports Build Collaboration" to fund the purchase of athletic equipment, and another titled "America, The Land Of The Immigrant Experience" to fund the purchase of an Alexa Show and two Alexa Dots to facilitate a research project based on immigration to the United States.  (*Id.* ¶¶ 59-60; ECF No. 47-2 at 11, 14.)  Plaintiff's biography on the site stated:  "Over 96% of the school's population receive free lunch, 10% are English language learners and 29% are special education students."  (ECF No. 47-2 at 22.)

This description did not apply to the District, (P's Depo. 1 at 84:3-18), causing Defendants to be concerned Plaintiff had collected funds under false pretenses, (*id.* at 79:14-22, 89:16-90:2; Ross Aff. ¶ 8; Lambert Aff. ¶ 9).  At a meeting on November 2, 2017, (*see* ECF No. 49-3 at 2), Defendant Lambert expressed concern to Plaintiff that she was misrepresenting the District in order to receive donations, and that Plaintiff should return the donations, (Ds' 56.1 Stmt. ¶ 43; P's Depo. 1 at 81:17-20, 82:10-17).  Plaintiff states that at the meeting, she informed Defendants that she had written the "sports grant" proposal, which had been funded, over the summer for her previous school before being hired by the District, (P's Aff. ¶ 25), but she conceded she intended to use the equipment at the District, (P's Depo. 1 at 85:19-21).  Plaintiff had written the proposal for the immigrant project while was working at the District.  (P's Aff. ¶ 25.)  She also says Defendant Lambert informed her that the District was a high-performing school district and was a predominately white community with a high tax bracket and therefore the grant donations should not be accepted.  (*Id.* ¶ 26.)  Plaintiff says she told Lambert,

> I came from a Chinese immigrant background . . . and [] a program on diversity would make everybody, including people at the school with immigrant backgrounds, feel included. . . .  I also argued that all of the children, somewhere down the line came to this country from another country. . . .  I further argued that the project which would also

8

have student's [*sic*] interviewing immigrant family members, would have been good for students to learn about diversity and inclusiveness at the school district.

(*Id.*)  Defendant Lambert, according to Plaintiff, "angrily" replied that there was no diversity, all the students are white, and the District could not have a diversity grant, as diversity was not relevant.  (*Id.* ¶ 27.)  Defendants deny Plaintiff's rendition that their concerns had to do with the nature of the project; rather, they took issue with how Plaintiff obtained the donations.  (Ds' Reply 56.1 Stmt. ¶ 18.)  According to Lambert, she never suggested that the racial makeup of the school was why the money should be returned, nor did she quarrel with the nature of the projects, but rather she was concerned that the funds had been obtained in a manner that could be regarded as fraudulent.  (Lambert Aff. ¶¶ 9-10.)[5]

An incident occurred in mid-November 2017 about which the parties provide different accounts.  Plaintiff states a student was disruptive in the IMC, and after he was warned, she asked him to leave, at which point he accused her of being racist.  (P's Aff. ¶ 36.)  She claims she asked the student how she was racist and suggested that perhaps *he* was racist, given that she was allegedly the only staff member of color.  (*Id.*)  According to Plaintiff, the student responded angrily, saying he paid $35,000 in taxes and paid her salary so he should not have to leave the library.  (*Id.*)  Plaintiff claims she was "upset and shaken" after this incident.  (*Id.* ¶ 33.)  She says she reported it to Lambert and the assistant principal, telling them that she thought the student's behavior was racist.  (*Id.*)  She does not say she asked for any particular action to be taken.  According to Defendants, the male student was wearing a cast and mistakenly said he had "Tommy Lee" surgery, instead of "Tommy John" surgery.  (Lambert Aff. ¶ 11.)  After he made

_____

[5] The main (but not only) donor for Plaintiff's projects turned out to be Plaintiff herself, using her married name, but Plaintiff never revealed this fact to Defendants during their discussions.  (ECF No. 47-2 at 8, 12; Ds' 56.1 Stmt. ¶ 35; P's Depo. 1 at 87:16-90:3.)

this comment, Plaintiff removed the student from the IMC, which led to the Plaintiff and the student accusing each other of being racist. (*Id.*) Defendant Lambert claims she met with Plaintiff after receiving a report about this incident and that Plaintiff's account of the event was very similar to the student's. (*Id.*) According to Lambert, Plaintiff did not ask to file a discrimination complaint or take any other course of action. (*Id.*) Plaintiff says no "Tommy Lee" incident occurred and that she had never heard of "Tommy John" surgery until after this case was filed. (P's Aff. ¶ 39.)

Lambert also says she was concerned that Plaintiff did not develop good working relationships with other teachers. (Lambert Aff. ¶ 8.) She states that multiple teachers informed her – and she herself observed – that when teachers brought their classes to the library, Plaintiff would leave materials for them and participate if summoned, but otherwise she remained in her inner office and did not interact with the students. (*Id.*) These teachers told Lambert that because of their negative experiences with Plaintiff, they stopped trying to collaborate with her on activities in the IMC. (*Id.*) Plaintiff does not dispute these facts but states, without providing specifics, that she collaborated with teachers on various projects. (P's 56.1 Stmt. ¶ 14.)

In mid-December, several parents of District students emailed Plaintiff, copying Defendants Ross and Lambert, expressing concerns that noisy and boisterous activities in the IMC – such as a trampoline and remote-control toys – were inappropriate and were preventing students from having a quiet place to study. (Lambert Aff. ¶ 12; Ross Aff. ¶¶ 9-10; *see* ECF No. 49-4 at 2-4; ECF No. 49-5 at 2-6; ECF No. 49-6 at 2-5; ECF No. 49-7 at 2-4.) Defendants Ross and Lambert claim they also separately received complaints from students, parents, and teachers about activities in the IMC and their impact on the learning environment. (Lambert Aff. ¶ 12; Ross Aff. ¶ 10.) Specifically, they allege that parents complained that the IMC was noisy and

distracting, and that activities undertaken by Plaintiff were neither age-appropriate nor tied to the curriculum. (Lambert Aff. ¶ 12; Ross Aff. ¶ 10.) Lambert says she received similar complaints from teachers and the middle school principal, that she herself observed distracting and sometimes juvenile activities in the IMC, and that she felt Plaintiff was not taking the complaints seriously. (Lambert Aff. ¶ 12.)

Plaintiff asserts that she maintained a suitable environment in the IMC, (P's 56.1 Stmt. ¶ 15), and that Lambert had approved the activities about which the parents – who were in a Facebook group together – had complained, (*id.* ¶ 16; P's Aff. ¶¶ 44, 49). Plaintiff claims she informed Defendant Lambert that the claims were false and likely linked to the earlier racial incident with the male student. (P's Aff. ¶¶ 47-48.) When asked whether she believes race played a role in parents raising these concerns, Plaintiff testified, "Yes. . . . Because a lot of what is in the e-mails is fabrications. Because they didn't come in and check out if they were concerned about the library or what your child was going in. I know I would go in." (P's Depo. 1 at 106:25-107:8.)

Plaintiff asserts that sign-in sheets for the IMC showed that from September until the end of the year, "patron usage went up from 182 visits a day to 245 a day." (P's 56.1 Stmt. ¶ 13.) In a performance evaluation dated October 5, 2017, Plaintiff received 4 "Highly Effective" scores, 16 "Effective" scores, and 1 "Developing" score for 21 total benchmarks. (ECF No. 53-4 at 1-3.) In a performance evaluation dated December 18, 2017, Plaintiff received 1 "Highly Effective" score, 14 "Effective" scores, and 1 "Developing" score for 16 total benchmarks. (ECF No. 53-3 at 1-3.) Plaintiff also received a supportive email from the president of the school board on December 12, 2017. (P's Aff. ¶ 31; ECF No. 32-9 at 2.) She was never disciplined or formally counseled. (Ds' Reply 56.1 Stmt. ¶ 3.)

###       3.      Plaintiff's Termination

In March 2018, Lambert formally informed Ross that Plaintiff should not continue in the LMS position in light of the issues that had come up during her first year.  (Lambert Aff. ¶ 13; Ross Aff. ¶ 11.)  In an April 12, 2018 letter, Ross notified Plaintiff that her probationary appointment as a LMS would be discontinued and she would not be asked to return for the 2018-2019 school year.  (ECF No. 48-3.)  The letter also stated, "[I]f the District does not receive your resignation by Friday, June 1, 2018, my recommendation to terminate your employment will be considered by the Board at a meeting to take place on June 4, 2018."  (*Id.*)  Plaintiff claims that in a meeting the same day, Lambert told her that she was being let go because she "did not fit in the school culture," (P's Aff. ¶ 53),[6] and Lambert used as an example that Plaintiff arranged an author visit without checking on what the teachers were having their students read, and that the teachers felt pressured to have their students attend, (P's Depo. 1 at 122:2-16, 132:2-12).  Plaintiff also claims that Defendants never informed her that the reason for terminating her had to do with parents' complaints against her.  (P's Aff. ¶ 50.)[7]

Plaintiff testified that during the meeting, Lambert said she would give Plaintiff a letter of recommendation so that she could find work elsewhere, (P's Depo. 1 at 122:5-6), but when Plaintiff subsequently asked for that letter, Lambert said Plaintiff would need to submit a letter of

_____

[6] Plaintiff claims, in all three versions of her 56.1 Statement, that Ross and Lambert both said, individually and in separate meetings, that she was being let go because she "did not fit in the school culture." (P's 56.1 Stmt. ¶ 5; ECF No. 70 ¶ 9; ECF No. 53 ¶ 5.)  For support she cites her deposition, but in her deposition, she attributes the remark only to Lambert.  (P's Depo. 1 at 123:23-124:18.)  Likewise, in her affidavit she attributes the remark only to Lambert.  (P's Aff. ¶ 53.)

[7] Defendants do not address the "culture" comment, but assert that their reasons for terminating Plaintiff's probationary employment had nothing to do with race, age, or protected activity.  (Lambert Aff. ¶¶ 16-18; Ross Aff. ¶¶ 14-18.)

resignation first, (P's Depo. 2 at 136:8-19).  Plaintiff says she did not resign because she thought if she did so, she would not be entitled to unemployment, (P's Aff. ¶ 2), which Defendants dispute in light of Plaintiff's testimony that she refused to resign because she "didn't have a job yet," (P's Depo. 2 at 144:20-22; s*ee* D's Reply 56.1 Stmt. ¶ 4).  On June 4, 2018, the District's Board voted to terminate Plaintiff's probationary employment, (ECF No. 48-4 at 2), and on September 17, 2018, the Board unanimously voted to have Follansbee return as the LMS, (Ross Aff. ¶ 13; Lambert Aff. ¶ 15).  Plaintiff states that the year after, Defendants hired Marnita Brown, a white woman in her mid-forties, as the LMS.  (P's Aff. ¶¶ 6, 17.)  Brown was a library aide before Plaintiff came to the District, but was still working toward the certification to serve as an LMS at the time Plaintiff was let go.  (P's Aff. ¶¶ 6, 17, 61; P's Depo. 1 at 146:10-22.)

Plaintiff testified that Lambert discriminated against her because of her age.  When asked why Lambert would do so given that Lambert is older than Plaintiff, Plaintiff testified, "Well, I think a lot of the staff were younger and I was older and she wasn't used to getting push back. . . .  Because when I had a problem, I would tell her, as an older, more experienced person."  (P's Depo. 1 at 162:21-163:10.)  When asked why she believed Lambert or Ross recommended her termination because of her age, Plaintiff stated, "Because it was an issue when I was protesting staying late for after school activities and I told them that I didn't want to do it. I was coerced into doing it with the threat of tenure being held over my head."  (*Id.* at 134:12-21.)

Plaintiff states that she was the only non-white faculty member at the school, (P's Aff. ¶ 1), and testified that she believed Ross discriminated against her because of her age and race, (P's Depo. 1 at 166:6-8).  When asked why Ross would hire Plaintiff if "he's going to discriminate against [her] because of [her] Asian race," Plaintiff responded, "Because he had the

intention of having Marnita Brown all along who was younger and white.  She didn't have her certification yet and he needed that time period for her to get certified."  (*Id.* at 166:15-25.)

**B.**     **Procedural History**

Plaintiff filed this case on April 1, 2020, alleging four claims against Ross, Lambert, and the District, including two claims under 42 U.S.C. § 1983 captioned "Retaliation" but seemingly alleging both race discrimination and retaliation for protected activity, in violation of 42 U.S.C. § 1981 and the Fourteenth Amendment; an age discrimination claim under the Fourteenth Amendment; and a breach of contract claim.  (Compl. ¶¶ 43-52.)  After Defendants answered the Complaint, (ECF No. 6), the Court held an initial conference and set a discovery schedule, (Minute Entry dated Aug. 26, 2020.)

After an unsuccessful mediation, (ECF No. 13), Defendants submitted a pre-motion letter in advance of their anticipated motion for summary judgment, (ECF No. 16).  The Court set a briefing schedule at a conference on June 10, 2021.  (Minute Entry dated June 10, 2021.)

Defendants moved for summary judgment on July 12, 2021.  (ECF Nos. 19-24.) Plaintiff's counsel sought an extension to oppose, which was granted, (ECF No. 28), but did not submit opposition until almost three weeks past the extended deadline, (ECF Nos. 30-34), and exceeded the Court's page limits without the advance permission required by my individual practices.  Along with his opposition, Plaintiff's counsel requested a *nunc pro tunc* extension of time and permission to exceed the page limits.  (ECF No. 35.)  I denied the application for a *nunc pro tunc* extension, without prejudice to renewal with more information; denied the application for a forty-two page brief; permitted a thirty-page brief; and reminded counsel that all facts require a record citation and that his brief needed to contain a table of contents and table of authorities.  (ECF No. 36.)  Counsel never re-submitted either the application for a *nunc pro tunc*

extension or a revised brief, and on December 27, 2021, the Court was advised that counsel had

passed away on December 1, 2021.  (ECF No. 37.)  I thereafter denied Defendants' motion for

summary judgment without prejudice to renewal after a period for Plaintiff to attempt to find

counsel.  (ECF No. 41; *see* ECF No. 43.)  When she was unsuccessful, she began representing

herself, and the submissions described in footnote 2 above followed.

## II.    LEGAL STANDARD

### A.    Motion for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of

material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence

sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d

Cir. 2008).  "The mere existence of a scintilla of evidence in support of the [non-movant's]

position will be insufficient; there must be evidence on which the jury could reasonably find for

the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than

simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory

allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

**B.** *Pro Se* **Plaintiffs**

Submissions by *pro se* plaintiffs are to be examined with "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010), interpreted "to raise the strongest arguments that they suggest," *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*) (cleaned up), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014).  "It is through this lens of leniency towards *pro se* litigants that this Court must consider a defendant's motion for summary judgment against a *pro se* plaintiff."  *Adams v. George*, No. 18-CV-2630, 2020 WL 5504472, at *5 (S.D.N.Y. Sept. 8, 2020).  *Pro se* status "does not, however, excuse a *pro se* litigant from making the showing

required to defeat summary judgment; he or she must offer more than 'bald assertions, completely unsupported by evidence' to overcome the motion."  *Keesh v. Quick*, No. 19-CV-8942, 2022 WL 2160127, at *4 (S.D.N.Y. June 15, 2022) (quoting *Wisdom v. Loiodice*, No. 17-CV-04837, 2020 WL 4431590, at *4 (S.D.N.Y. July 31, 2020)).

## III.    DISCUSSION

### A.    *McDonnell Douglas* Framework

Plaintiff alleges that Defendants discriminated against her based on her race and her complaints of race discrimination, thereby violating 42 U.S.C. § 1981 and the Fourteenth Amendment.  (Compl. ¶¶ 43-46.)  She also alleges Defendants discriminated against her on the basis of her age in violation of the Fourteenth Amendment.  (*Id.* ¶¶ 47-49.)  All of these claims, enforced through 42 U.S.C. § 1983, are analyzed under the familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Littlejohn v. City of N.Y.*, 795 F.3d 297, 315 (2d Cir. 2015) ("Retaliation claims under . . . § 1981 are . . . analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework.") (cleaned up); *Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) ("[C]laims for race . . . discrimination under Section[ ] 1981 . . . are analyzed under the burden-shifting framework set forth in *McDonnell Douglas*."); *Mitchell v. N.Y.C. Dep't of Educ.*, No. 20-CV-1555, 2021 WL 8013770, at *6 (S.D.N.Y. May 7, 2021) (age discrimination claims under § 1981 generally analyzed under *McDonnell Douglas* framework), *report and recommendation adopted*, 2022 WL 621956 (S.D.N.Y. Mar. 3, 2022); *Thomas v. N.Y.C. Health & Hosps. Corp.*, No. 02-CV-5159, 2004 WL 1962074, at *16 n.7 (S.D.N.Y. Sept. 2, 2004) ("While *McDonnell Douglas* . . . involved claims brought under Title VII of the Civil

Rights Act of 1964, courts have held that discrimination and retaliation claims brought under 42 U.S.C. §§ 1981 and 1983 follow the same analysis.") (cleaned up).

Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). The burden of proof at this stage is "'*de minimis*.'" *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 582 (S.D.N.Y. Aug. 27, 2012) (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)). "[B]ut it is not non-existent." *Pleener v. N.Y.C. Bd. of Educ.*, No. 05-CV-973, 2007 WL 2907343, at *11 (E.D.N.Y. Oct. 4, 2007) (cleaned up), *aff'd*, 311 F. App'x 479 (2d Cir. 2009) (summary order).

Once the plaintiff makes a *prima facie* showing of discrimination or retaliation, a rebuttable presumption of discrimination or retaliation arises and the burden of production shifts to the defendant "to articulate a legitimate, non-discriminatory [or non-retaliatory] reason" for the adverse employment action. *Carlton v. Mystic Transp., Inc*., 202 F.3d 129, 134 (2d Cir. 2000); *see Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (*prima facie* "showing creates a presumption of retaliation, which the defendant may rebut by articulating a legitimate, non-retaliatory reason for the adverse employment action.") (cleaned up). "The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination [or retaliation] was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis in original) (cleaned up).

If the defendant proffers a legitimate, non-discriminatory or non-retaliatory reason for the challenged employment action, the presumption drops away, and the plaintiff must prove that the reason offered by the defendant was not its true reason but rather a pretext for unlawful

discrimination or retaliation.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143
(2000); *Ya-Chen Chen*, 805 F.3d at 70.  The plaintiff must produce "sufficient evidence to
support a rational finding that the legitimate, non-discriminatory [or non-retaliatory] reasons
proffered by the defendant were false, and that more likely than not discrimination [or
retaliation] was the real reason for the employment action."  *Weinstock*, 224 F.3d at 42 (cleaned
up).  "To get to the jury, it is not enough to disbelieve the employer; the factfinder must also
believe the plaintiff's explanation of intentional discrimination [or retaliation]."  *Id.* (cleaned up).
"In short, the question becomes whether the evidence, taken as a whole, supports a sufficient
rational inference of discrimination [or retaliation]."  *Id.*  The ultimate burden of persuasion
remains with the plaintiff to show that the defendant intentionally discriminated or retaliated.
*See Reeves*, 530 U.S. at 143.

**B.**     **Retaliation Based on Complaints of Race Discrimination**

         **1.**     ***Prima Facie* Case**

To establish a *prima facie* case of retaliation, an employee must show that (1) the
employee "was engaged in protected activity, (2) the employer was aware of that activity, (3) the
employee suffered a materially adverse action, and (4) there was a causal connection between the
protected activity and that adverse action."  *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 104
(2d Cir. 2020) (cleaned up).

"The term 'protected activity' refers to action taken to protest or oppose statutorily
prohibited discrimination."  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000),
*superseded on other grounds as stated in Jones v. N.Y.S. Metro D.D.S.O.*, 543 F. App'x 20, 22
(2d Cir. 2013) (summary order).  "In order for an employee's complaints to be a 'protected
activity' they must relate to an alleged violation of [antidiscrimination law], *i.e.*, the complaints

must relate to race or gender." *Taylor v. Fam. Residences & Essential Enters., Inc*., No. 03-CV-6122, 2008 WL 268801, at *13 (E.D.N.Y. Jan. 30, 2008) (cleaned up).  "Complaining about general unfairness, unaccompanied by any indication that plaintiff's protected class status caused the unfairness, does not qualify as protected activity." *Batiste v. City Univ. of N.Y.*, No. 16-CV-3358, 2017 WL 2912525, at *10 (S.D.N.Y. July 7, 2017).  "Otherwise, any employee who is disgruntled or dissatisfied with any aspect of his or her employment would ultimately find relief in [antidiscrimination law] even when race or gender was not an issue." *Taylor*, 2008 WL 268801, at *13 (cleaned up).  But to satisfy the first element, a plaintiff "need not establish that the conduct she opposed was actually a violation of [Section 1981], but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp*., 136 F.3d 276, 292 (2d Cir. 1998) (cleaned up).  "The objective reasonableness . . . is to be evaluated from the perspective of a reasonable similarly situated person." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 17 (2d Cir. 2013).

The second element rests on the principle that "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by [the applicable statute]." *Id.* at 15 (cleaned up).  There must be something in the protests "that could reasonably have led [the employer] to understand that [unlawful discrimination] was the nature of her objections." *Galdieri-Ambrosini*, 136 F.3d at 292.

As to the third element of the retaliation test, a materially adverse action is one that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006); *see Fincher*

20

*v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir.2010) (applying *Burlington* to §
1981 retaliation claim).

Finally, "[t]o succeed on a Section 1981 retaliation claim, a plaintiff must establish that
his or her protected activity was a but-for cause of the alleged adverse action by the employer."
*Knight v. Nassau Cnty.*, 852 F. App'x 42, 44 (2d Cir. 2021) (summary order); see *Spratt v.
Verizon Commc'ns Inc.*, 633 F. App'x 72, 73 (2d Cir. 2016) ("A supervisor's retaliatory actions
must be the 'but-for' cause of the employer's adverse employment action" under § 1981.)  "A
causal connection may be established either:  (1) indirectly, by showing that the protected
activity was followed closely by discriminatory treatment, or through other circumstantial
evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2)
directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."
*McDowell v. N. Shore-Long Island Jewish Health Sys., Inc.*, No. 10-CV-3534, 2012 WL 850607,
at *8 (E.D.N.Y. Mar. 13, 2012) (cleaned up).

### 2.    Protected Activity

Plaintiff alleges that Defendants terminated her employment in retaliation for protected
activities consisting of (1) "protesting" to Defendants that "programs encouraging diversity
should be pursued," (Compl. ¶ 20; *see id.* ¶¶ 16-22), (2) informing Defendants that claims from
various parents about the IMC were false, (*id*. ¶¶ 23-24), and (3) reporting a "racist" student to
the Defendants, (*id.* ¶¶ 25-26; *see* ECF No. 60-1 at 2).  Defendants argue that none of these
constitute protected activities.  The Court agrees as to the first two but disagrees as to the third.

Plaintiff maintains that she engaged in protected activity when, during discussions of the
donorschoose.org controversy, she protested that programs on diversity and inclusion would be
good for the District.  (Compl. ¶ 20; *see* P's Aff. ¶ 26.)  But this is not a protected activity

because it did not involve opposing or protesting statutorily prohibited discrimination.  First, the grants at issue did not deal with "diversity" in the way Plaintiff believes they did.  One of the grants – titled "Sports Build Collaboration" – was intended to fund ropes, ladders, cones, parachutes, and other running equipment with the goal of helping students "discover how team sports are the building blocks for a successful life and foster lifelong dispositions."  (ECF No. 47-2 at 14.)  Plaintiff claims she informed Defendants this grant was written and funded for her prior school before she arrived at the District.  (P's Aff. ¶ 25.)  Even so, there is no mention of or connection to diversity or race.  This grant simply funded sports equipment, which does not touch on racial issues or come remotely close to a protest against racial discrimination.  No reasonable, similarly situated individual could find that this project involved issues of race, or that denial of its funding constituted racial discrimination.

Another grant, titled "America, The Land Of The Immigrant Experience," similarly does not seem to involve issues of racial discrimination.  Despite its focus on the similarities of immigrant experiences, (*see* ECF No. 47-2 at 11-12), the grant – which sought an Alexa Show, two Alexa Dots, and smart accessories for the library's media center – did not mention race. (*Id.*)

Even if the underlying program related to racial issues, which is far from clear, the dispute over whether Plaintiff acted properly in seeking the funds did not involve statutorily prohibited discrimination.  Assuming, as I must, that Lambert said that the funds should not be accepted because the school was all-white (as opposed to the more likely scenario that she said the funds should not be accepted because the school was not needy), Plaintiff's response advocating for diversity education is simply not the same thing as protesting unlawful discrimination.  Plaintiff never communicated to Defendants that she thought they were

discriminating on the basis of race by directing Plaintiff to decline the funds; she admits that the

biography did not accurately reflect the District, (P's Depo. 1 at 84:3-18); and she does not

dispute that Defendants communicated to her their concern relating to misrepresentations made

about the District in soliciting the donations, (*id.* at 81:17-20, 89:16-20).  A reasonable jury

could not conclude that Defendants' denial of the donations was a racially discriminatory

employment practice, or that Defendants could reasonably have understood that Plaintiff's

protesting that denial, or advocating for diversity education, was a complaint of race

discrimination amounting to protected activity within the meaning of the relevant statutes.

Plaintiff second alleged protected activity – that she protested to Defendants that

complaints from a variety of parents were false – also fails as protected activity.  Plaintiff

believes that the emails from parents about the IMC being too noisy and distracting for a

studying and learning environment for their children, on which Lambert and/or Ross were

copied, (*see* ECF No. 49-4; ECF No. 49-5; ECF No. 49-6; ECF No. 49-7), came from a group of

"predominantly white parents organized via Facebook," (Compl. ¶ 23).  She believes her race

played a role in them raising their concerns "[b]ecause a lot of what is in the e-mails is

fabrications.  Because they didn't come in and check out if they were concerned about the library

or what your child was going in."  (P's Depo. 1 at 107:4-8.)[8]  Plaintiff may sincerely believe that

the complaints were influenced by her race, but there is no evidence that Plaintiff ever

communicated to Defendants that the complaining parents were hostile to her race.[9]  Plaintiff

---

[8] This reasoning employs the fallacy discussed at page 36 below.  That one is falsely accused, and one is a member of a protected class, does not mean that one was accused because one is a member of a protected class.

[9] Taking as true that Plaintiff told Lambert that Plaintiff thought that the parental complaints were "likely linked" to the incident with the boy who accused her of racism, (P's Aff.

defending how she ran the library simply could not have reasonably been understood by Defendants to be opposition to conduct prohibited by § 1981 or the Fourteenth Amendment.

Plaintiff's third alleged protected activity, where she reported to Defendants behavior by a student that she thought was racist, at least presents a fact issue as to whether it suffices as protected activity under the statutes. Defendants argue that Plaintiff did not file a discrimination complaint or ask them to take any particular course of action when she complained, (ECF No. 46 ("Ds' Mem.") at 12), but a protected activity in the context of a § 1981 or Title VII retaliation claim may be "informal – an employee does not need to lodge a formal complaint of discrimination." *Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 227 (E.D.N.Y. 2018) (cleaned up); *see Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) ("While a protected activity generally involves the filing of a formal complaint of discrimination . . . , the Second Circuit has recognized that 'protected activity' includes informal protests of discriminatory employment practices, including making complaints to management.") (cleaned up). It is a closer question whether the informal complaint in this case was "sufficiently specific to make it clear that the employee is complaining about conduct prohibited by [§ 1981 or the Fourteenth Amendment]." *Risco*, 868 F. Supp. 2d at 110. Those provisions prevent businesses or government entities from discriminating, generally speaking, but they do not outlaw racism on the part of individuals. *Cf. Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134-35 (2d Cir.1999) (black police officer who reported racist activity by other officers against black citizens had not engaged in protected activity under Title VII because his "opposition was not directed at an unlawful *employment practice* of his employer") (emphasis in original); *Tnaib v. Document Techs., LLC*, 450 F. Supp.

---

¶ 47), Defendants could not reasonably have understood that vague surmise to be a claim of racism, let alone a claim of a racist employment practice.

2d 87, 92 (D.D.C. 2006) ("Section 1981 does not create a grounds for a cognizable claim against a co-worker.").  But Plaintiff could plausibly have believed she was protesting racism in her workplace, and Defendants could have reasonably so understood, so I will assume that the complaint about the student being racist was protected activity.

a.   <u>Causal Connection</u>

There is no evidence from which a reasonable jury could find a causal connection between the protected activity (or the other complaints which I have found do not constitute protected activity) and Plaintiff's termination.  Plaintiff relies on the temporal proximity between these incidents and her termination, along with Defendant Lambert's comment about her not fitting into the school's culture, as evidence supporting an inference of retaliation.  (Compl. ¶¶ 31-32.)  But no reasonable jury could find a causal connection from that evidence.

Plaintiff testified that during the April 12, 2018 meeting at which she was informed of her termination, Lambert twice said that Plaintiff did not fit in with the school's culture, citing specifically the issues with the graphic novelist.  (P's Depo. 1 at 123:23-125:25, 132:2-12.)  But Lambert did not mention Plaintiff's race during the meeting.  (*Id.* at 133:15-17.)  Indeed, Lambert did not ever make any comment suggesting any hostility toward Plaintiff's race or toward the making of any protected statements.  Plaintiff would ask the finder of fact to conclude that "culture" is somehow code for undertaking protected activity, but to so conclude would, on the record here, be sheer speculation.  There is simply no evidence on which a rational juror could rely to conclude that the reference to school culture meant that Lambert was terminating Plaintiff because she had complained about the altercation with the allegedly racist student (or advocated for diversity education or defended her management of the ICM).  Indeed, Plaintiff acknowledged that Lambert first mentioned "culture" in a previous conversation regarding the

25

expectation in the District that teachers supervise after-school activities.  (*See* P's Depo. 2 at 29:12-30:6; 30:24-31:8, 38:8-21.)  Where the record is otherwise devoid of evidence of hostility based on race or toward complaints of race discrimination, reading race into an otherwise neutral comment – especially where lack of collaboration with other teachers was mentioned and where anyone in Lambert's position might well seek a benign way to avoid an uncomfortable conversation – is a bridge too far.[10]

Temporal proximity also does not support a potential causal connection.  Plaintiff was informed of her termination via a letter from Defendant Ross on April 12, 2018, (ECF No. 48-3 at 2), and on June 4, 2018, the District's Board voted to terminate Plaintiff's probationary employment, (ECF No. 48-4 at 2).  The incident with the student occurred in mid-November, (P's Aff. ¶ 33), five months before she was informed of her termination and almost seven months before she was officially terminated.  For mere temporal proximity to serve as sufficient evidence of a causal connection, courts "uniformly hold that the temporal proximity must be very close."  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (cleaned up).  The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001), but courts have found that five months is too long to draw a causal inference based on a temporal relationship, *see*

---

[10] Likewise, Lambert's comment that teachers supervising extracurricular activities was part of the school culture cannot reasonably be interpreted as having anything to do with race or protected activity.  Indeed, it was made before any of the alleged protected activity.  Further, Plaintiff confirmed that race had not been brought up in the conversation, and even her subjective interpretation – that "if you stand out, you're going to get hammered down the hardest.  So she told me that I had to fit in and be like everybody else," (P's Depo. 2 at 38:8-21) – cannot in context reasonably be regarded as racially tinged.

*Stringfellow v. Wyckoff Heights Med. Ctr.*, No. 95-CV-3041, 1998 WL 760286, at *6 (E.D.N.Y. Sept. 9, 1998) (no causal connection found where alleged retaliatory treatment occurred more than four months after alleged protected activity); *Cobian v. New York City*, No. 99-CV-10533, 2000 WL 1782744, at *18 (S.D.N.Y. Dec. 6, 2000) ("Standing alone, the lapse of more than four months . . . is insufficient evidence of a causal connection."), *aff'd*, 23 F. App'x 82 (2d Cir. 2001) (summary order); *Dixon v. Int'l Fed'n of Accts.*, 416 F. App'x 107, 110 (2d Cir. 2011) (summary order) (lapse of four months between plaintiff's alleged protected activity and termination was insufficient evidence to establish a causal connection).

Because neither the timing nor the "culture" comment – whether considered separately or together – support a causal connection between protected activity and Plaintiff's termination, her *prima facie* case for retaliation fails.

### 3.     Legitimate Non-Discriminatory Reasons

Even if Plaintiff were able to establish a *prima facie* case of retaliation, Defendants have articulated a legitimate, nondiscriminatory reason for Plaintiff's termination:  that throughout her first year, she demonstrated poor judgment.  (Ds' Mem. at 14.)  Specifically, Defendants describe the incidents with the author, the misrepresentations regarding the donations, the dispute with the student, the lack of collaboration with other teachers, the parental complaints about the atmosphere in the IMC, similar complaints from teachers, and the provision of age-inappropriate activities.  (Lambert Aff. ¶¶ 7-12; Ross Aff. ¶¶ 8-11.)

### 4.     Motive/Pretext

"If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation."  *Summa v. Hofstra*

*Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (cleaned up).  A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered . . . reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).  For example, "evidence of disparate treatment of similarly situated individuals allows for the conclusion that the reasons advanced by an employer in the Title VII context are pretextual." *Summa*, 708 F.3d at 130.  "But nothing in law would permit [a court] to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable." *St. Mary's Honor Ctr.*, 509 U.S. at 514-15.

Here, Plaintiff fails to address directly whether Defendants' proffered reasons were pretextual.  To the extent Plaintiff argues that she "received a favorable email," dated December 12, 2017, from the school board president, "who met regularly with administration and had an active interest in the staff, curriculum and educational outcomes through direct leadership," (ECF No. 60-1 at 2; *see* ECF No. 32-9 at 2), this does reflect anything about the views of Lambert and Ross four months later or otherwise demonstrate pretext.  That Plaintiff received satisfactory classroom observations and was not formally disciplined, (*see* P's 56.1 Stmt. ¶¶ 2-3), also does not serve as evidence of pretext.  Defendants do not claim to have terminated Plaintiff because of poor classroom observations or because she violated terms or conditions of employment; rather, their reason for terminating Plaintiff's probationary term had to do with issues that arose throughout the year.  That Plaintiff received satisfactory classroom observations does not negate the instances in which Defendants believed she displayed poor judgment.

To the extent Plaintiff alleges that Defendants' concern with the misrepresentations in connection with the donations was pretextual because she explained that she had written the biography before arriving at the District, (P's Aff. ¶¶ 26-29), this also is not sufficient.  Plaintiff presents no evidence undermining the evidence that Defendants sincerely believed Plaintiff was leaving the District open to accusations of fraud.  (Ross Aff. ¶ 8; Lambert Aff. ¶ 9.)  Likewise, even if the parental criticism was unwarranted, or Lambert previously approved the activities in the IMC, or the other teachers unfairly characterized their interactions with Plaintiff, there is no dispute that those criticisms reached Lambert and Ross, and there is no evidence suggesting that the resulting concerns were insincere or related in any way to Plaintiff's protected activity.  *See McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case, however, we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what *motivated* the employer; the factual validity of the underlying imputation against the employee is not at issue.") (emphasis in original) (cleaned up); *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 509 (S.D.N.Y. 2010) ("[W]hether the complaints against Plaintiff were truthful, and whether, if true, they justify termination, are immaterial disputes.").[11]

In short, "[t]he only evidence plaintiff offers to support h[er] claim of retaliation is h[er] disagreement with defendants that h[er] employment conduct was inappropriate." *Jean v. Acme Bus Corp.*, No. 08-CV-4885, 2012 WL 4171226, at *15 (E.D.N.Y. Sept. 19, 2012).  But "it is

---

[11] Additionally, if Plaintiff is arguing that she was terminated because she did not fit in with the culture at the school, rather than based on Defendants' proffered reasons, this also fails to serve as sufficient evidence of pretext.  In the absence of any evidence that the term was code, as discussed above, failing to fit into the school culture is not a discriminatory or retaliatory reason, and indeed encompasses Defendants' proffered reasons.

well settled that the mere fact that an employee disagrees with an employer's evaluation of that

employee's misconduct or deficient performance, or even has evidence that the decision was

objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered

reasons are a pretext for termination."  *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397

(E.D.N.Y. 2008).  Plaintiff may have raised fact issues as to whether her conduct was as

problematic as Defendants make out, but she has provided no evidence from which a rational

juror could conclude that retaliation for protected activity was at work.  "[P]laintiff must show

that defendant's proffered reasons are pretext for [retaliation], not that they are unfair or

incorrect."  *Renaud v. Fed. Express Corp.*, No. 10-CV-4261, 2012 WL 34089, at *8 (E.D.N.Y.

Jan. 6, 2012).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation

claims.

## C.     Age Discrimination

Plaintiff brings a claim for age discrimination in violation of the Equal Protection Clause

of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.  (Compl. ¶¶ 48-49.)[12]

A § 1983 equal protection claim of age-based employment discrimination is analyzed

under the *McDonnell-Douglas* framework.  *Burkhardt v. Lindsay*, 811 F. Supp. 2d 632, 651

(E.D.N.Y. 2011); *Stampfel v. City of N.Y.*, No. 04-CV-5036, 2005 WL 3543696, at *3-4

---

[12] "It is an open question in our circuit whether the ADEA preempts age discrimination
claims under Section 1983." *Piccone v. Town of Webster*, 511 F. App'x 63, 63 n.1 (2d Cir.
2013) (summary order).  "However, courts within the Second Circuit have consistently held that
the ADEA does not preclude age discrimination actions brought pursuant to Section 1983, so
long as such claims are brought to vindicate distinct violations of constitutional rights." *Wu v.
Metro-N. Commuter R.R.*, No. 14-CV-7015, 2015 WL 5567043, at *9 (S.D.N.Y. Sept. 22, 2015)
(collecting cases).  Because the Court finds that Plaintiff fails to make out a *prima facie* case, it
need not address this "open question."

(S.D.N.Y. Dec. 27, 2005).  "Under this familiar approach, plaintiff must first establish a *prima facie* case of discrimination by showing (1) membership in a protected class, (2) qualification for the position held, (3) adverse employment action, and (4) circumstances giving rise to an inference of discrimination."  *Stampfel*, 2005 WL 3543696, at \*3; *see Pejovic v. State Univ. of N.Y. at Albany*, No. 17-CV-1092, 2018 WL 3614169, at \*5 (N.D.N.Y. July 26, 2018).

Defendants do not dispute that Plaintiff was a month away from her fiftieth birthday when she applied for the LMS position, (Ds' 56.1 Stmt. ¶ 64), that she was qualified for her position when hired or that she suffered an adverse employment action when she was terminated, (Ds' Mem. at 16).  But Defendants argue that they are entitled to summary judgment because Plaintiff has not provided sufficient to support an inference of age discrimination.  (*Id.*)

Plaintiff argues that Defendants asked about the ages of her children during her interview, failed "to grant her the customary three years of probation (instead of four)," and questioned her "professional commitment" due to her age.  (Compl. ¶ 48.)[13]  The latter apparently refers to Lambert's comment that Plaintiff could supervise afterschool activities because she did not have young children at home.  (ECF No. 60-1 at 3.)  Lastly, she states that her replacement by Marnita Brown, who is a decade younger than Plaintiff, also supports an inference of discrimination. (*Id.*)

None of the above evidence, singly or in combination, suffices to raise an inference of discriminatory intent on the part of Defendants.  There is no evidence that Defendants asked Plaintiff about her age.  Plaintiff's affidavit states only that Ross asked about the ages of her children, (P's Aff. ¶ 8), which is not the same thing.  Indeed, the ages of one's children reveals

---

[13] The Complaint also alleges that Defendants treated Plaintiff differently than similarly situated younger employees, (Compl. ¶ 48), but the record contains no evidence, and Plaintiff makes no argument, about any such employees.

little about one's age, given that, as Plaintiff acknowledged at her deposition, (*see* P's Depo. 1 at 64:16-19), one can have children in one's teens or forties.  Plaintiff testified that at no point during the interview did she reveal her age and no one made any negative comments about her age.  (*Id.* at 64:20-65:1.)  There is no evidence that the initial probationary term of four years – promptly reduced to the proper three – was anything other than a mistake, but even if it were not, it has no logical connection to Plaintiff's age.  Defendants did not mention Plaintiff's age when terminating her, (*id.* at 133:15-17), or at any other time.  Plaintiff perceives Lambert's comment that Plaintiff could supervise after-school activities as a reference to her age – which, for the reasons just stated, it is not – but it is clear from her own description of the conversation, (P's Depo. 2 at 30:21-31:8), that Lambert's concern was whether Plaintiff could or would stay after school, not how old she was.

Even a direct reference to a protected characteristic is not enough to raise an inference of discrimination.  *See Buckner v. County of Sullivan*, No. 12-CV-3770, 2015 WL 437408, at *4 (S.D.N.Y. Feb. 3, 2015) ("[S]tatements that merely acknowledge an individual's membership in a protected class do not support an inference of discriminatory animus.").  The indirect references to which Plaintiff points surely do not.  Moreover, the interview occurred during the summer of 2017 and the discussion about after-school activities occurred in September or October 2017, long before the termination decision in April 2018.  The comments to which Plaintiff points, even if they evidenced hostility based on age (which they do not), are too far removed from the employment decision to give rise to an inference of discrimination.  *See Hasemann v. United Parcel Serv. of Am., Inc.*, No. 11-CV-554, 2013 WL 696424, at *7 (D. Conn. Feb. 26, 2013) ("Comments too remote in time and context cannot support an inference of discriminatory intent.") (collecting cases); *Aiossa v. Bank of Am., N.A.*, No. 10-CV-1275, 2012

WL 4344183, at *2 (E.D.N.Y. Sept. 21, 2012) (where incidents are "too far removed in time,"
they are insufficient to "raise an inference of discrimination.").

As further support, Plaintiff claims that Marnita Brown, who is six years younger than
she, (P's Aff. ¶ 6), was her replacement.  "The replacement of a plaintiff by a significantly
younger employee may support an inference of discrimination."  *Testa v. Carefusion*, No. 14-
CV-5202, 2016 WL 4099113, at *4 (E.D.N.Y. Aug. 2, 2016) (collecting cases).  But Plaintiff's
argument fails for two reasons.  First, Plaintiff concedes that Follansbee, who is older than
Plaintiff, replaced her as LMS during the 2018-2019 school year and that Brown took over in
2019-2020.  (P's Aff. ¶ 61.)  Second, even if Brown was Plaintiff's replacement, Brown is well
over forty and only six years younger than Plaintiff, not "significantly younger."  (Ds' 56.1 Stmt.
¶ 72.)  "That a plaintiff is replaced by another in the same protected class weighs heavily against
the inference that she suffered discrimination."  *Montanile v. Nat'l Broadcast Co.*, 211 F. Supp.
2d 481, 487 (S.D.N.Y. 2002).

Moreover, Lambert and Ross were the same people who hired Plaintiff only eight months
before recommending her termination.  The "same actor" inference arises "when the person who
made the decision to fire was the same person who made the decision to hire," thereby making it
"difficult to impute to her an invidious motivation that would be inconsistent with the decision to
hire."  *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).  "This inference should
be accorded substantial weight where the time period between the hiring and firing is less than
two years."  *Cooper v. Morgenthau*, No. 99-CV-11946, 2001 WL 868003, at *6 (S.D.N.Y. July
31, 2001) (collecting cases).  The "same actor" inference is strong here:  Plaintiff was terminated
within eight months of beginning her position, and Ross and Lambert not only had "important
influence" over Plaintiff, but were also members of the same protected class.  *See id.*  ("The

same actor inference applies when the supervisor had 'important influence' if not complete authority over the plaintiff. This inference applies even more strongly to [Plaintiff's] age discrimination claim because [Defendant] was a member of the same protected class.") (cleaned up); *see also Senese v. Longwood Cent. Sch. Dist*, 330 F. Supp. 3d 745, 769-70 (E.D.N.Y. 2018) (inference of discrimination undercut by fact that decisionmaker who recommended termination was member of same protected class as plaintiff).

The lack of evidence supporting an inference of discrimination, and indeed the evidence contradicting any such inference, prevents Plaintiff from establishing a *prima facie* case of age discrimination, thereby warranting summary judgment for Defendants. Further, as discussed with Plaintiff's retaliation claim, even if Plaintiff had made out a *prima facie* case, Defendants have articulated a legitimate, nondiscriminatory reason for her termination, which Plaintiff has not shown to be a pretext for discrimination. Therefore, Plaintiff's age discrimination claim fails.

**D.**     **Race Discrimination**

To make out a *prima* facie case of race discrimination under § 1981, a plaintiff must show that: (1) she is a member of a racial minority; (2) the defendants intended to discriminate on the basis of race; and (3) the discrimination concerns one of the statute's enumerated activities (such as the making of contracts). *Silva v. Farrish*, 47 F.4th 78, 90 (2d Cir. 2022); *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000). "[A] plaintiff must initially plead an ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

Plaintiff's § 1981 claim fails because she has not provided evidence from which a rational jury could conclude that Defendants intended to discriminate against her on the basis of her race – that "but for" her race, she would not have been terminated.  As discussed above with Plaintiff's age discrimination claim, there is no evidence Defendants even mentioned Plaintiff's race in any of their meetings or when she was terminated.  That Defendants expressed concern that Plaintiff did not fit into the school "culture" also does not support a finding of intent to discriminate based on race, for the reasons set forth above in connection with the retaliation claim.  There is simply no basis in this record to infer that that term was code for race. Moreover, the "same actor" inference again applies here, as Lambert and Ross were the same people who both hired and fired Plaintiff.  They clearly knew Plaintiff's race when she was hired and she was terminated about eight months later.  And if Plaintiff is correct in surmising that Ross hired her just to fill the LMS slot until Brown could replace her, (*see* P's Depo. 1 at 166:17-25) – which is sheer speculation – that theory negates any inference that Plaintiff's race was the reason for her termination.[14]

---

[14] Plaintiff's argument that Defendants only hired Plaintiff as a stopgap until Brown, their library clerk, got her degree and could be hired as an LMS, (P's Depo. 1 at 166:15-25) – for which there is no evidence – does not really make sense, because if it were so, Defendants would have waited to dismiss Plaintiff until Brown had the necessary credentials.  But if it is true, as Plaintiff contends, it shows that the adverse employment action was based on favoritism toward a longtime employee, not discrimination or retaliation for protected activity (which activity all occurred after the time this plot would have been hatched).  *See McCarthy v. Brennan*, No. 19-CV-1386, 2020 WL 5549072, at *7 (N.D.N.Y. Sept. 16, 2020) ("[S]imple favoritism is not actionable discrimination under Title VII absent some minimal indication that it is motivated by an intent to discriminate on the basis of a plaintiff's protected characteristic."), *aff'd sub nom. McCarthy v. DeJoy*, No. 20-3600, 2022 WL 519180 (2d Cir. Feb. 22, 2022).

Finally, as with other claims, even if Plaintiff had made out a *prima facie* case,

Defendants have provided non-discriminatory reasons for their actions, and Plaintiff has not

shown them to be pretexts for discrimination.  The race discrimination claim therefore also fails.

\*\*\*

I do not doubt that Plaintiff believes she has been treated unfairly, and perhaps she has

been.  But in bringing claims of discrimination and retaliation, she appears to "rely on the fallacy

that because she belongs to a protected class [or engaged in what she believes is protected

activity], it is plausible that anything negative that happened to her at work was because of her

membership in that class [or that activity]."  *Watkins v. First Student, Inc.*, No. 17-CV-1519,

2018 WL 1135480, at \*15 (S.D.N.Y. Feb. 28, 2018) (collecting cases); *see Grillo v. N.Y.C.*

*Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that

he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little

more than cite to his alleged mistreatment and ask the court to conclude that it must have been

related to his race.") (cleaned up); *Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015

WL 1499618, at \*42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say:  "I belong to a

protected class; something bad happened to me at work; therefore, it must have occurred because

I belong to a protected class") (cleaned up).  Even if Defendants' concerns about her

performance were misplaced, there is simply insufficient evidence for a reasonable jury to

conclude that Defendants either discriminated against Plaintiff based on her age or race, or

retaliated against her for protesting unlawful discrimination.

## E.   **Breach of Contract**

The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh

in favor of declining to exercise supplemental jurisdiction where all federal-law claims are

eliminated before trial.  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006)

(citing 28 U.S.C. § 1367(c)(3)) (*quoting Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350

(1988)).  Although Defendants have strong arguments as to why this claim is without merit,

having granted summary judgment on all claims over which this Court has original jurisdiction,

and having considered the factors set forth in *Cohill*, I decline to exercise supplemental

jurisdiction over Plaintiff's breach of contract claim, which is dismissed without prejudice.

IV.    **CONCLUSION**

      For the foregoing reasons, Defendants' motion for summary judgment is GRANTED

and, for the same reasons, Plaintiff's motion for summary judgment is DENIED.  The federal

claims are dismissed with prejudice and the breach of contract claim is dismissed without

prejudice.  The Clerk of Court is respectfully directed to terminate the pending motions, (ECF

Nos. 44, 61), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated:  December 12, 2022
      White Plains, New York

_____
              CATHY SEIBEL, U.S.D.J.